# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  17-1475-M |
| AOL accounts associated with bobcongress@aol.com | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Eastern___ District of ___Virginia___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1343, 1001, 1519, 52 U.S.C. §§ 30104, 30109, and 30116 | Conspiracy, wire fraud, false statements, falsification of records, causing false campaign contribution reports, excess contributions |

The application is based on these facts:

See Attached Affidavit of Probable Cause

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet. 

_____
*Applicant's signature*

Jonathan R. Szeliga, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __November 1, 2017__

_____
*Judge's signature*

City and state: __Philadelphia, PA__

HON. CAROL SANDRA MOORE WELLS, U.S. Magistrate
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Jonathan R. Szeliga, your affiant, having been duly sworn, depose and state as follows:

I have been employed as a Special Agent (SA) with the FBI for over 1 year and am currently assigned to the Philadelphia Division. I am currently assigned to a white collar / public corruption criminal squad. I have investigated several white collar and public corruption cases. I have worked on and assisted with Title III applications and intercepts; I have assisted in the writing and reviewing of search warrants; I have analyzed financial records; and I have directed cooperating witnesses to conduct consensual recordings. Prior to the FBI, I had over five years of experience at a public accounting firm as an auditor, working in the firm's financial institution industry group.

1. I personally participated in the investigation of the offenses described herein. As a result of my participation in this investigation, and through interviews with and analysis of reports and other information provided by other law enforcement personnel, I am familiar with this investigation. On the basis of all of the information I have learned since the beginning of this investigation, I allege herein facts to show that probable cause exists to believe that in the specified Email account associated with bobcongress@aol.com (hereinafter referred to as the TARGET EMAIL #1, that there is evidence of violations of: 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (producing false records), 52 U.S.C. § 30104 (causing false campaign contribution reports), and 52 U.S.C. §§ 30109 and 30116 (limits on campaign contributions and expenditures) (collectively, the "SUBJECT OFFENSES"). This affidavit is submitted in support of an application for a search warrant authorizing the search and seizure of the specified email addresses, TARGET EMAIL #1 (as described in Attachment A).

2.     In particular, there is probable cause to believe that the information sought in these email accounts, concerning the specifics of the above offenses, includes (i) the nature, extent, and methods of the herein-described criminal activities; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities; (iii) the distribution and transfer of the money involved in these activities; (iv) records detailing and outlining criminal activity; and (v) the location and source or resources used to finance the illegal activities.

3.     The statements contained in this affidavit are based in part on hearsay, including information by other Special Agents of the FBI. The information set forth herein is also based on my training and experience as a Special Agent. All statements are provided in sum and substance and in part. Since this affidavit is being submitted for the limited purpose of establishing probable cause to search certain email accounts and seize certain evidence, I have not included each and every fact known to me concerning this investigation.

4.     Based upon my training and experience, I have learned that AOL, Inc. provides Internet based e-mail access to the general public, and that information, records, and stored electronic communications, including opened and unopened email relating to AOL customers' accounts, may be located on AOL's computer servers. I am aware that computers located at AOL contain records, information and stored electronic communications belonging to third parties. AOL also provides free online storage space to its users. Users can store electronic communications as well as other types of computer files in this space. E-mail messages can be saved on an account either by the AOL default settings or by the user's choice. In addition, AOL may retain information and records regarding its customers and their use of their email accounts or other provided services.

2

### Overview of the Investigation

5.     As explained in detail below, I have probable cause to believe that
KENNETH SMUKLER, ROBERT BRADY, DONALD "D.A." JONES, JIMMIE MOORE,
and CAROLYN CAVANESS and others known and unknown have committed violations of
18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519
(producing false records), 52 U.S.C. § 30104 (causing false campaign contribution reports),
and 52 U.S.C. § 30116 (limits on campaign contributions and expenditures).  The investigation
has uncovered evidence which indicates that BRADY, SMUCKLER, and JONES utilized
SMUKLER's and D.A. JONES' corporations to conceal payments from BRADY's campaign
to repay MOORE campaign debts in exchange for MOORE's agreement to withdraw from the
2012 Democratic primary race against BRADY for U.S. Representative in Pennsylvania's 1st
District.  The evidence shows that these concealed payments were made for the purpose of
removing BRADY's primary opponent from the race and willfully undermining various
provisions of the Federal Election Campaign Act (FECA) in the process.

6.     As discussed in detail below, these goals were accomplished by routing
three payments totaling $90,000 from BRADY's campaign through political consulting
companies to the campaign manager for MOORE's campaign, who used a portion of the funds
to pay debts owed by the MOORE campaign, keeping the remainder of the money for herself
and MOORE.  The payments were routed in this manner so that the FEC reports filed by the
BRADY and MOORE campaigns would not show that BRADY had made a payment to his
primary opponent in violation of FECA contribution limits.

3

## Background of the investigation

7.      In June of 2011, JIMMIE MOORE announced that he was challenging

BRADY, the incumbent U.S. Representative in Pennsylvania's 1st District, in the 2012

Democratic primary.   MOORE had recently retired after serving 12 years as a Municipal

Court Judge in Philadelphia.   CAROLYN C. CAVANESS was MOORE's Campaign

Manager.

8.      On or about February 29, 2012, MOORE dropped out of the

Democratic primary, leaving BRADY unchallenged.   On November 2, 2012, BRADY

defeated Republican JOHN FEATHERMAN in the general election.

9.      During the 2012 Democratic primary, BRADY's campaign committee

was BOB BRADY FOR CONGRESS; MOORE's campaign committee was JIMMIE MOORE

FOR CONGRESS.  Campaign committees raise and spend money for the candidate the

campaign committee represents.  Money is raised from contributions, and spent on

expenditures for the campaign. The Federal Election Commission requires campaign

committees to file quarterly campaign finance reports truthfully and accurately disclosing

quarterly activity related to contributions, expenditures, debts and loans of the committee.

10.     The Federal Election Campaign Act (the Act) places monetary limits on

contributions to support candidates for federal office and prohibits contributions from certain

sources. Title 11 of the Code of Federal Regulations (11 CFR) establishes limits on how much

money an individual can contribute to a federal office candidate. Pertinent to this investigation,

during the time period in question, 2011 through 2012: (A) 11 CFR 110.1 limited individual

campaign contributions to $2,500 per candidate for both the primary and general elections, such

that an individual was permitted to contribute a combined total of $5,000 in an election cycle to

a candidate; (B) 11 CFR 102.12(c)(2) limited contributions from one federal candidate's authorized committee to another federal candidate's authorized committee to $2,000 per candidate for both the primary and general elections, for a combined total of $4,000 in an election cycle; and (C) 11 CFR 114.2 and 114.5 prohibited banks, unions, and corporations from making any contributions to individual campaigns.

11.     Additionally, during 2011 and 2012, 11 CFR 102.7 required a candidate's campaign committee to have a treasurer before it conducted financial transactions. Pursuant to 11 CFR 103.3(a), the treasurer was responsible for depositing the committee's receipts into the designated campaign depository (i.e., the bank or credit union) within 10 days of receipt, and pursuant to 11 CFR 104.14(d) the treasurer was obligated to authorize all committee expenditures or designate agents for that purpose.

12.     KENNETH SMUKLER is a political analyst and consultant. Through interviews conducted, SMUKLER has been identified as a close associate of BRADY. SMUKLER owns and operates several companies including BLACK AND BLUE MEDIA (BBM), VOTERLINK DATA SYSTEMS (VDS), INFOVOTER TECHNOLOGIES (IVT), LIBERTY CITY PRESS (LCP) and SCISMUK Inc. Of those, BBM, VDS, and IVT all purport to provide political services including consulting, analysis, and public relations.

13.     DONALD A. JONES (DA JONES) is a political consultant with over 30 years of international, national, state and local political experience. He is the President and founder of D.A. JONES & ASSOCIATES/D. JONES & ASSOCIATES, a political consulting firm in 1985. Through interviews conducted, JONES has been identified as a close associate of BRADY.

14. During the course of the investigation, FBI agents reviewed and analyzed campaign finance reports for BRADY and MOORE's campaign committees.

15. A review of the June 2012 campaign finance report for BRADY's campaign committee, BOB BRADY FOR CONGRESS, showed a $40,000 disbursement to VDS on June 11, 2012 for "Survey and Polling Services." A review of the September 2012 campaign finance report for BOB BRADY FOR CONGRESS showed a $25,000 disbursement to VDS on July 11, 2012 for "Acquisition of Cross Tabs". A review of the October 2012 campaign finance report for BOB BRADY FOR CONGRESS showed a $25,000 disbursement to JONES & ASSOCIATES on August 23, 2012 for "Political Consulting."

16. A review of VDS's PNC Bank account revealed two payments to CAVANESS in 2012. Both payments to CAVANESS were preceded by payments in the same amount to VDS from BRADY's committee, BOB BRADY FOR CONGRESS. The timing of these transactions suggests that VDS was used to pass an illegal campaign contribution from BRADY to MOORE to pay down MOORE's campaign debt.

17. The first series of transactions began with a $40,000 check dated June 11, 2012 from BOB BRADY FOR CONGRESS's PNC Bank account which was made payable to VDS, and which was deposited into VDS's bank account on June 11, 2012. On June 18, 2012, a check in the amount of $40,000 made payable to CAROLYN CAVANESS was drawn from VDS's account. The check was dated June 13, 2012, two days after the $40,000 deposit from BOB BRADY FOR CONGRESS.

18. The second series of transactions began with a $25,000 check dated July 10, 2012 from BOB BRADY FOR CONGRESS's PNC Bank account made payable to VDS, which was deposited into VDS's bank account on July 11, 2012. On July 26, 2012, a

6

check dated July 17, 2012 in the amount of $25,000 made payable to CAROLYN CAVANESS was drawn from VDS's account.

19.     Two invoices sent from CAVANESS to SMUKLER falsely stated that the purpose of these payments was to purchase a poll that MOORE had commissioned in February 2011 analyzing a potential primary matchup between MOORE and BRADY. In fact, as discussed below, BRADY had been in possession of that poll since December 2011. Moreover, your affiant has seen no evidence to suggest that MOORE ever transferred ownership of this poll to CAVANESS or to CAVASENSE, further illustrating the false nature of the invoices. In addition, JIMMIE MOORE FOR CONGRESS campaign finance reports showed that MOORE paid approximately $45,000 for the poll, which was approximately $20,000 less than BRADY and SMUKLER purportedly paid for the poll in June and July 2012.

20.     A review of D. JONES & ASSOCIATES' Bank of America Bank account revealed one payment to CAVASENSE & ASSOCIATES INC., a company created by CAVANESS in the spring of 2012 at MOORE's direction for the sole purpose of using money from the BRADY campaign to repay MOORE campaign debts. The payment to CAVANESS was preceded by a payment in the same amount to D. JONES & ASSOCIATES from BRADY's committee, BOB BRADY FOR CONGRESS. The timing of this transaction suggests that D. JONES & ASSOCIATES was used to pass an illegal campaign contribution from BRADY to MOORE to pay down MOORE's campaign debt.

21.     From a review of records reviewed by your affiant and his fellow agents, this transaction began with a $25,000 check dated August 23, 2012 from BOB BRADY FOR CONGRESS's PNC Bank account made payable to D. JONES & ASSOCIATES, which was deposited into D. JONES & ASSOCIATES' bank account on August 28, 2012. On September

7

4, 2012, a check dated August 30, 2012 in the amount of $25,000 made payable to CAVASENSE & ASSOCIATES was drawn from D. JONES & ASSOCIATES' account.

22.    An invoice sent from CAVANESS to JONES falsely stated that the purpose of this payment was to compensate CAVANESS for consulting services performed for JONES. In fact, CAVANESS, who was interviewed by FBI agents, has admitted that she did not perform any consulting services for D. JONES & ASSOCIATES, that this payment was actually a payment from BRADY's campaign to MOORE's campaign, and that the invoice was created to cover up the transfer of the money from BRADY FOR CONGRESS through D. JONES & ASSOCIATES to CAVASENSE. Search warrants executed on the email accounts of CAVANESS and JONES and a grand jury subpoena for documents related to the $25,000 payment served on JONES revealed no evidence of any consulting work performed by CAVANESS for JONES.

23.    Bank records show that a portion of the funds transmitted to CAVANESS from VDS and to CAVASENSE from D. JONES & ASSOCIATES was used to pay debts owed by JIMMIE MOORE FOR CONGRESS. Thus, on August 1, 2012, six days after CAVANESS received the second payment from VDS, CAVANESS transferred $13,000 from her personal bank account to an account she had recently opened for CAVASENSE. In August and September of 2012, CAVANESS used approximately $21,000 of the money in the CAVASENSE account to repay vendors who were owed money by JIMMIE MOORE FOR CONGRESS.

24.    Bank records also show that CAVANESS and MOORE used a portion of the funds transmitted to CAVANESS from VDS to repay loans that MOORE had made to his own campaign, which totaled over $80,000. Thus, shortly after CAVANESS received the first

8

payment from VDS, CAVANESS wrote checks totaling $19,500 from her personal account to MOORE. The memo line on each of these checks reads, "Reimbursements." The remainder of the funds received from VDS and D. JONES & ASSOCIATES was spent by MOORE and CAVANESS on personal expenses. It should be noted that, according to campaign finance reports filed by JIMMIE MOORE FOR CONGRESS, at the time that MOORE withdrew from the primary, JIMMIE MOORE FOR CONGRESS owed CAVANESS approximately $30,000 for work on the campaign.

25.     On June 19, 2013, the last campaign finance report was filed by MOORE's campaign committee, JIMMIE MOORE FOR CONGRESS. This report, an amended report for the 4th quarter of 2012, stated that JIMMIE MOORE FOR CONGRESS had no cash on hand and had debts and other obligations totaling approximately $167,158. Of that debt, approximately $85,700 was reported to be loans from MOORE to JIMMIE MOORE FOR CONGRESS. JIMMIE MOORE FOR CONGRESS also reported a $15,000 obligation to MOORE for "campaign expenses" and $34,835 owed to CAVANESS for "consulting." This campaign finance report did not report receiving contributions from BRADY FOR CONGRESS, VDS, or D. JONES & ASSOCIATES. Nor did the report mention the payment of the debts to campaign vendors from CAVASENSE using the funds provided by BRADY FOR CONGRESS through VDS and D. JONES & ASSOCIATES. Rather, the report falsely listed the debts that had been repaid as outstanding obligations of the campaign.

26.     MOORE has reported to law enforcement that, in February 2012, he attended a meeting with BRADY arranged by former Philadelphia mayor WILSON GOODE, SR. At that meeting, BRADY agreed that his campaign would pay $90,000 toward MOORE's campaign debts in exchange for MOORE's agreement to withdraw from the primary race. In

9

that conversation, BRADY and MOORE agreed and understood that the payment from

BRADY's campaign to MOORE's campaign would be disguised, and the deception would

include hiding at least some of the BOB BRADY FOR CONGRESS campaign funds as the

purchase of the aforementioned poll. MOORE further reported that he instructed CAVANESS

to create and register a shell-corporation, CAVASENSE & ASSOCIATES LLC, to receive the

funds from BRADY. MOORE also admitted that SMUKLER's and JONES' companies were

used to pass the money from BOB BRADY FOR CONGRESS to CAVASENSE &

ASSOCIATES LLC. Further, MOORE stated that BRADY had no actual use for the poll that

was the purported explanation for the money that BRADY FOR CONGRESS paid MOORE via

VDS and D. JONES & ASSOCIATES. MOORE also admitted that the reason the money was

paid through VDS, D. JONES & ASSOCIATES, and CAVASENSE was to conceal the fact that

BRADY FOR CONGRESS was giving money to MOORE.

27.     At MOORE's direction and in order to further the scheme, CAVANESS

incorporated CAVASENSE & ASSOCIATES LLC on May 29, 2012.

28.     Through a consensual search of SMUKLER's computer and email

accounts on March 21, 2017, Agents obtained an email dated December 11, 2011 from TARGET

EMAIL #1 to ksblackblue@gmail.com, another email account owned by SMUKLER.

29.     The email from TARGET EMAIL #1 was a forwarded email between

TARGET #1 and GREGG KRAVITZ's email address, greggkravitz@gmail.com. This email

contained MOORE's polling analysis and data from Lake Research partners. This analysis and

data were substantially the same documents that were purportedly purchased in June 2012 as part

of the scheme to cover-up the illegal campaign donation from BOB BRADY FOR CONGRESS.

The emails showing that BRADY received MOORE's poll in December 2011 constitute

10

evidence that the invoices purporting to show that VDS purchased the poll from CAVASENSE in June 2012 for $65,000 were intended to cover up the true source and purpose of the payments.

30.    In addition, evidence gathered in the course of the investigation includes an email on December 11, 2011, in which BRADY forwarded the email from KRAVITZ attaching the poll to a BRADY staffer named JAMIE FLEET.

31.    Through a consensual search of SMUKLER's computer and email accounts on March 21, 2017, Agents obtained an email dated February 28, 2012 from TARGET EMAIL #1 to ks@vlinkdata.com, another email account owned by SMUKLER.

32.    The email from TARGET EMAIL #1 contained the following message: "Carolyn Cavaness.  267 239 0163 Moore contact."  Smukler, via ksblackblue@gmail.com, responded to TARGET EMAIL #1 "Got it."  The email from TARGET EMAIL #1 was sent two days after the meeting that occurred between BRADY, GOODE, and MOORE, and one day before MOORE announced he withdrew from the race.  In a proffer session with CAVANESS on June 26, 2017, CAVANESS stated that the telephone number BRADY provided SMUKLER was for MOORE's campaign office.

33.    In a voluntary, non-custodial interview conducted on April 18, 2017, BRADY denied paying MOORE to withdraw from the 2012 primary.  BRADY initially stated that, after MOORE withdrew from the primary, BRADY agreed to give MOORE some money to help pay campaign debts.  When confronted with the fact that the payments to MOORE were routed through SMUKLER's company VDS, BRADY stated that purpose of the payments from VDS to CAVANESS was to purchase a poll.  BRADY stated that he did not have the poll before VDS purchased it, a statement that is contradicted by the emails discussed above.  BRADY also denied ever using D. JONES & ASSOCIATES as a pass-through to send money to another

11

organization, a statement that is contradicted by the evidence discussed above.

## Probable Cause

34.     The facts set forth above establish probable cause to believe that

SMUKLER, BRADY, JONES, MOORE, and CAVANESS were involved in the commission of

several crimes, including conspiracy, false statements, producing false records, false campaign

contribution reports, and violating limits on campaign contributions and expenditures.

Furthermore, BRADY's email account, bobcongress@aol.com (TARGET EMAIL #1), is likely

to contain evidence of these crimes.  In particular, the December 11, 2011 email from KRAVITZ

to TARGET EMAIL #1, as well as the emails from TARGET EMAIL #1 forwarding the

KRAVITZ email, constitute evidence that the poll purchase justification for the June and July

2012 payments from VDS to CAVANESS was a sham to conceal an unlawful campaign

contribution.  In addition, TARGET EMAIL #1 is likely to contain evidence that will rebut an

anticipated defense to the charges set forth above.  Based on BRADY's FBI interview and

information proffered by BRADY's attorneys, the government believes that BRADY likely will

argue that the payments from VDS to CAVANESS to purchase the poll in June and July 2012

were legitimate notwithstanding the fact that BRADY already possessed this poll because

BRADY wanted to prevent further dissemination of negative information about him and his

family included in the poll.  To rebut this defense, the government intends to introduce evidence

that BRADY took no steps between December 2011, when he first learned of the poll's

existence, and June 2012 to prevent dissemination of the poll or to obtain exclusive ownership of

the poll.  KRAVITZ has reported that neither BRADY nor anyone else from BRADY's

campaign contacted him about not further disseminating the poll after he sent the December

2011 email. A search of BRADY's email account would support the government's position by showing that BRADY sent no emails to anyone (including KRAVITZ) about this topic between December 2011 and June 2012.

CONCLUSION

35.    Based on the aforementioned information, your affiant respectfully submits that there is probable cause to believe that specified email account bobcongress@aol.com (TARGET EMAIL #1) will contain evidence, as more fully described in Attachment A, regarding the above-described schemes and above-referenced crimes, including emails and electronic records and other evidence as specified in Attachment A relevant to the investigation and that the items contained in this account constitute evidence, fruits, and instrumentalities of the criminal violations noted above.

36.    Under 18 U.S.C. § 2703(g), a law enforcement officer does not have to be present for either the service or the execution of the warrant. It is sufficient for us to service it by fax, email or regular mail upon AOL, Inc.

37.    Under 18 U.S.C. § 2703(b)(1)(A), notice to the customer or subscriber is not required when the government obtains the contents of the electronic communications using a search warrant.

38.    Under 18 U.S.C. §§ 2711(3) and 3127, this Court has the authority to issue the warrant directing AOL, Inc. to comply even though they are not located in this district, because the Court has jurisdiction over the offense being investigated.

39.    It is further respectfully requested this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory. Sealing is necessary

13

because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

40.    It is further respectfully requested this Court issue an order precluding AOL, Inc. from giving notice to its subscribers. As noted above, because the government is using a search warrant, there is no duty to notify the customer. Sending a copy to AOL, Inc., the place where the warrant is to be executed, is sufficient. This warrant relates to an ongoing criminal investigation that is not public, and the details of the investigation are not known to all subjects of the investigation. Accordingly, there is reason to believe that notification of the existence of this warrant will seriously jeopardize the investigation, including by giving the subjects an opportunity to destroy evidence or tamper with potential witnesses. Some of the evidence in this investigation is stored electronically. If alerted to the existence of the warrant, the subjects under investigation could destroy that evidence, including information saved to their personal and work computers. Therefore, I request that the Court issue an order under 18 U.S.C. § 2705(b), precluding AOL, Inc. from giving notice to its subscriber.

Respectfully submitted,

Jonathan R. Szeliga
Special Agent

Subscribed and sworn before me
this /5+ of November 2017

HON. CAROL SANDRA MOORE WELLS
United States Magistrate Judge

14

## ATTACHMENT A

Locations to be searched:

AOL accounts associated with:

bobcongress@aol.com

Located on the e-mail servers, or other servers at AOL, Inc.
22000 AOL Way
Dulles, VA 20166
Or on servers at any other location owned or otherwise controlled by AOL, Inc.

## ATTACHMENT B

Particular Things to be Seized

**I.    Information to be disclosed by AOL, Inc. Microsoft Corporation Online**

   **Services.**

   To the extent that the information described above is within the possession, custody, or control of AOL, Inc. including any emails, records, files, logs, or information that have been deleted but are still available to AOL, are required to disclose the following information to the government for each account or identifier listed in herein:

   a.    All records or other information regarding the identification of the email accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   b.    The types of service utilized;

   c.    All records or other information stored at any time by an individual using the account, including emails, address books, contact and buddy lists, calendar data, pictures, and files;

   d.    All records pertaining to communications between AOL, Inc. and any person regarding the account, including contacts with support services and records of actions taken.

**II.    Items to be Seized from the locations identified.**

   All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (producing false records), 52 U.S.C. § 30104 (causing false campaign contribution reports), and 52 U.S.C. §§ 30910 and 30116 (limits on campaign contributions and expenditures) (collectively, the "SUBJECT OFFENSES") for the email accounts, including the following:

   1.    For the time period of January 1, 2011 through the present, any and all documents and/or records related to Jimmie Moore, Carolyn C. Cavaness, JIMMIE MOORE FOR CONGRESS, CavaSense, Voterlink Data Systems, Kenneth Smukler, Donald Jones, and/or DA Jones and Associates.

2